IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| GREGORY JOHNSON, | ) CASE NO.  1:21-CV-01860-JRA |
| Plaintiff, | ) |
| vs. | ) JUDGE JOHN R. ADAMS |
| | ) UNITED STATES DISTRICT JUDGE |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) MAGISTRATE JUDGE |
| | ) JONATHAN D. GREENBERG |
| Defendant. | ) **REPORT AND RECOMMENDATION** |
| | ) |

Plaintiff, Gregory Johnson ("Plaintiff" or "Johnson"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

# I.   PROCEDURAL HISTORY

In September 2012, Johnson filed applications for POD, DIB, and SSI, alleging a disability onset date of July 15, 2008[2] and claiming he was disabled due to mental condition and high blood pressure. (Transcript ("Tr.") 1173, 64, 81, 98, 112.)   The applications were denied initially and upon reconsideration, and Johnson requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 1173.)  On April 28, 2015, an ALJ issued a written decision that Johnson was not disabled.  (*Id.*)

On December 5, 2016, on joint stipulation of the parties, this Court reversed and remanded the 2015 decision.  (*Id.*)  On January 27, 2017, the Appeals Council vacated the 2015 decision and remanded the case back to the ALJ for resolution of several issues.  (*Id.*)  On October 17, 2017, an ALJ issued another decision finding Johnson was not disabled.  (*Id.*)

On August 13, 2018, Johnson filed another application for SSI, alleging a disability onset date of June 1, 2012.  (*Id.*)  This application was denied initially and upon reconsideration.  (*Id.*)

On September 16, 2019, this Court reversed and remanded the ALJ's decision, and the Appeals Council remanded the case to a new ALJ.  (*Id.*)  The Appeals Council directed the new ALJ to consolidate the 2018 application with the previous applications.  (*Id.* at 1174.)

On April 24, 2020, the new ALJ held a hearing, during which Johnson, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.* at 1173-74.)  On May 19, 2020, the ALJ issued a written decision finding Johnson was not disabled.  (*Id.* at 1173-1203.)  The ALJ's decision became final on August 2, 2021, when the Appeals Council declined further review.  (*Id.* at 1163-69.)

---

[2] At the April 24, 2020 hearing, Johnson amended his alleged onset date to February 2, 2011.  (Tr. 1174.)

2

On September 30, 2021, Johnson filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9, 12.)  Johnson asserts the following assignments of error:

(1)     The Administrative Law Judge erred in the amount of weight assigned to both treating and examining providers, in particular, Dr. Campbell, Dr. Swaringen, Dr. Carson, and Nurse Wiseley-Cortland.

(2)     Whether substantial evidence supports a further limitation of off task behavior which should have been included by the Administrative Law Judge in her Residual Functional Capacity Assessment.

(Doc. No. 9 at 25, 36.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Johnson was born in October 1964 and was 55 years-old at the time of his administrative hearing (Tr. 1202), making him a "person of advanced age" under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(e), 416.963(e).  He has at least a high school education and is able to communicate in English.  (Tr. 1202.)  He has past relevant work as a kitchen helper and cleaner.  (*Id*. at 1201.)

### B.     Medical Evidence[3]

On August 8, 2012, Johnson went to Euclid Hospital speaking in broken sentences and somewhat incoherent, reporting abuse at home and complaining of chest pain and alcohol problem.  (Tr. 297-98, 311.)  Johnson endorsed visual hallucinations and stated he had a plan to hurt himself.  (*Id*. at 312.)

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Johnson challenges only the ALJ's findings related to his mental impairments, the Court further limits its discussion of the medical evidence accordingly.

3

Treatment providers noted Johnson's speech was slurred and scrambled. (*Id.*) Treatment providers admitted Johnson overnight with diagnoses of alcohol intoxication and hallucinations. (*Id.* at 297-298, 311-312).

On August 17, 2012, Johnson saw Dr. Tamara Winfield at NEON after being referred by a caseworker. (*Id.* at 349.) Johnson reported he had been on Lorazepam but could not afford the medication. (*Id.*) Johnson complained of auditory and visual hallucinations, as well as trouble sleeping at night because of excessive movement of his lower extremity. (*Id.*) Johnson's fiancée accompanied him to his appointment. (*Id.*) Winfield found Johnson fully oriented and anxious, but with no suicidal ideation. (*Id.* at 350.)

On September 18, 2012, Johnson underwent an initial psychiatric evaluation with Dr. Michelle Romero. (*Id.* at 360-63.) Johnson reported depression and auditory hallucinations that had been worsening over the past two years with "more acute exacerbation" over the past nine months. (*Id.* at 360.) Johnson told Dr. Romero he was afraid to leave his house and often was afraid to leave his bedroom, he felt others were watching him and talking about him, he felt that others wanted to harm him, he saw shadows, and he felt the only thing that could protect him was his blanket. (*Id.*) Johnson endorsed trouble sleeping, decreased interest, low energy, poor concentration, low appetite, tearfulness, low self-esteem, and feelings of worthlessness/helplessness/hopelessness. (*Id.*) Johnson denied suicidal or homicidal ideation or plan. (*Id.*) Johnson reported being hospitalized twice of alcohol withdrawal delirium tremens. (*Id.*) Johnson told Dr. Romero he was very forgetful and asked her multiple times what year it was. (*Id.*)

On examination, Dr. Romero found less than full orientation, regressive behavior, unremarkable psychomotor behavior, delayed speech, flat affect, anxious mood, erratic/inconsistent memory, average

4

intellect, cooperative behavior, discouraged and hopeless attitude, distracted attention, poor reasoning, fair impulse control, poor judgment and insight, vague thought processes, and paranoid thought content with ideas of reference. (*Id.* at 362.) Dr. Romero diagnosed Johnson with schizophrenic disorder, depressive disorder not otherwise specified, and alcohol dependence syndrome. (*Id.*) Dr. Romero prescribed 2 mg of Risperdone and recommended Johnson seek treatment at Rosary Hall for alcohol dependence. (*Id.* at 362-63.)

On October 26, 2012, Johnson saw Dr. Winfield for follow up and reported heavy alcohol consumption. (*Id.* at 352.) Johnson reported he could not fill his Risperdol prescription because of cost and Dr. Winfield noted she would check the patient assistance program. (*Id.*) On examination, Dr. Winfield found Johnson fully oriented with a normal affect. (*Id.* at 353.) Johnson denied anxiety and suicidal ideation. (*Id.*) Dr. Winfield further found normal judgment, normal attention span and concentration, and normal speech. (*Id.*)

On November 16, 2012, Johnson saw Dr. Romero for follow up. (*Id.* at 357.) Johnson reported he was unable to afford the Risperdal. (*Id.*) Dr. Romero noted the medication was now available through NEON pharmacies, so Johnson could get the medication there. (*Id.*) Johnson's fiancée could not come with him that day, and Johnson was noted to be a poor historian. (*Id.*) On examination, Dr. Romero found appropriate appearance, full orientation, unremarkable behavior, appropriate speech, constricted affect, anxious mood, erratic/inconsistent memory, below average intelligence, a cooperative but discouraged attitude, distracted attention, fair reasoning, fair judgment, poor insight, concrete thought processes, paranoid thought content, and auditory hallucinations. (*Id.* at 358.) Dr. Romero renewed Risperidone. (*Id.* at 359.)

On December 1, 2012, in response to a state agency questionnaire, Dr. Winfield reported that Johnson's diagnoses included schizophrenia, depression, and hypertension.  (*Id.* at 341.)  Johnson's symptoms included auditory hallucinations, paranoia, insomnia, and anxiety.  (*Id.*)  Dr. Winfield opined Johnson's response to medications were fair, but there were compliance issues stemming from Johnson's lack of insurance and the high cost of medications.  (*Id.* at 342.)  Dr. Winfield noted "[l]imitations with communication, social skills due to paranoia and hallucinations."  (*Id.*)

On January 15, 2013, Johnson saw Dr. Romero for follow up.  (*Id.* at 371.)  Johnson reported "doing a little better" and the Risperidone was helping his sleep and decreasing the auditory hallucinations.  (*Id.*)  Johnson told Dr. Romero he had been getting out of his bedroom a bit and that he had stopped drinking alcohol except for New Year's.  (*Id.*)  Johnson also reported attending AA meetings and medication compliance.  (*Id.*)  On examination, Dr. Romero found signs of psychosis but no signs of mania, improved sleep and appetite, appropriate appearance, full orientation, anxious behavior, fidgeting, appropriate speech, anxious mood, constricted affect, erratic/inconsistent memory, below average intellect, cooperative and hopeful attitude, distracted attention, fair reasoning, fair impulse control, fair and improving insight and judgment, concrete thought processes, and decreasing paranoia and auditory hallucinations.  (*Id.* at 372.)  Dr. Romero increased Johnson's Risperidone.  (*Id.* at 373.)

On February 12, 2013, Johnson saw Dr. Romero for follow up.  (*Id.* at 375.)  Johnson reported being calmer during the daytime, sleeping better at night, and while he continued to hear voices at night occasionally, his paranoia had "greatly decreased overnight."  (*Id.*)  Johnson told Dr. Romero he was much better than he had been over the summer and he continued to maintain his sobriety and attend AA meetings.  (*Id.*)  On examination, Dr. Romero found signs of psychosis but no signs of mania, improved

6

sleep and appetite, appropriate appearance, full orientation, unremarkable behavior, soft speech, flat affect, intact memory, below average intellect, cooperative and hopeful attitude, distracted attention, fair reasoning, fair impulse control, fair insight and judgment, concrete thought processes, and paranoid thought content. (*Id.* at 376.)

On April 9, 2013, Johnson saw Dr. Romero for follow up. (*Id.* at 379.) Johnson reported doing well since his last appointment. (*Id.*) Johnson's fiancée stated Johnson was stable and his medication was working. (*Id.*) On examination, Dr. Romero found signs of psychosis but no signs of mania, improved sleep and appetite, appropriate appearance, full orientation, regressive behavior, soft speech, constricted affect, anxious mood, intact memory, below average intellect, cooperative and hopeful attitude, distracted attention, fair reasoning, fair impulse control, fair insight and judgment, concrete thought processes, and decreasing hallucinations and paranoia. (*Id.* at 380-81.) Dr. Romero continued Johnson's medications. (*Id.* at 381.)

On July 26, 2013, Johnson underwent a consultative psychological examination with J. Joseph Konieczny, Ph.D. (*Id.* at 384.) Dr. Konieczny noted Johnson was accompanied by his girlfriend, who waited for him to complete his assessment. (*Id.*) While Johnson was "occasionally vague in his presentation," he was able to provide relevant background information. (*Id.*) Johnson reported having regular contact with his siblings and described his relationships with them as being "fair." (*Id.*) Johnson told Dr. Konieczny he had never been hospitalized for psychiatric reasons. (*Id.* at 385.) Johnson stated he was disabled because he was schizophrenic and hears voices. (*Id.*)

On examination, Dr. Konieczny found adequate hygiene and grooming and a pleasant and cooperative demeanor. (*Id.*) However, Dr. Konieczny noted several times that Johnson's effort during

7

portions of the mental status examination "appeared to be quite suspect." (*Id.*)  Johnson could not count to ten, he described the shape of a ball as a square, he thought Thursday came after Tuesday, and he thought there were six days in a week.  (*Id.* at 385-86.)  Johnson spoke well and "[h]is level of speech appeared to be significantly greater than would be anticipated given his presentation during the mental status examination." (*Id.* at 386.)  Johnson demonstrated appropriate eye contact, denied depression and crying spells, and showed no signs of nervousness or anxiety.  (*Id.*)  Johnson reported he sometimes got anxious when other people were around.  (*Id.*)  Johnson told Dr. Konieczny he had a past history of paranoia, although he had not had paranoid thoughts for four to five months, and he heard voices which would call his name, although those episodes had decreased since starting medication a month before.  (*Id.*)  Dr. Konieczny found poor insight, moderate deficits in Johnson's awareness of the rules of social judgment and conformity, and marked deficits in Johnson's overall level of judgment.  (*Id.*)  Johnson reported being able to perform simple cooking tasks and having "minimal involvement in cleaning, laundry, and household activities." (*Id.* at 387.)

Dr. Konieczny diagnosed Johnson with psychotic disorder, not otherwise specified, and borderline intellectual functioning.  (*Id.*)  Dr. Konieczny opined Johnson would have:

- Limitations in his ability to understand, remember, and carry out instructions.

- Difficulty in maintaining focus and persistence on moderate to complex multi-step tasks.

- Significantly diminished tolerance for frustration and diminished coping skills, which would impact Johnson's ability to respond to simple supervision and interpersonal situations in the workplace, as well as his ability to respond to simple pressure situations in the workplace.

(*Id.*)

8

On August 16, 2013, Johnson saw Eileen Ross at NEON for individual therapy.  (*Id.* at 414.) Johnson reported he had been seeing Dr. Romero, but she was no longer with NEON, and he and his wife wanted to talk about his progress.  (*Id.*)  On examination, Ross found appropriate appearance, full orientation, unremarkable behavior, appropriate speech, appropriate affect, anxious mood, impaired long-term memory, below average intellect, cooperative and hopeful attitude, poor concentration, poor reasoning, poor impulse control, poor insight and judgment, blocked thought processes, and ideas of reference in thought content.  (*Id.* at 415.)

On August 19, 2013, Johnson underwent an Adult Diagnostic Assessment with Michele Javorek, PCC-S, and Linda Kimble, MSN, RN, CNP.  (*Id.* at 1674, 1682.)  Johnson reported being referred by NEON.  (*Id.* at 1674.)  While he had been seeing Eileen Ross there for counseling, he needed to see a provider for medication management since Dr. Romero was leaving NEON.  (*Id.*)  Johnson reported he did not hang out with anyone besides his fiancée, although he had a few elderly friends in their building, but he enjoyed volunteering and walking in the park.  (*Id.*)  Johnson did not like crowds or people so if he was not with his fiancée, he was by himself.  (*Id.*)  Johnson reported he was thinking of going back to church.  (*Id.*)  While medications helped, he still heard voices.  (*Id.* at 1679.)  On examination, Javorek found Johnson well-groomed, with average eye contact, activity, and speech, no delusions, auditory hallucinations, logical thought process, euthymic mood, flat affect, cooperative behavior, no impairment of orientation, memory, or attention/concentration, average intellect, and good insight.  (*Id.* at 1689-90.) Javorek and Kimble diagnosed Johnson with schizoaffective disorder, not otherwise specified, and anxiety state not otherwise specified.  (*Id.* at 1681.)

9

On August 29, 2013, Johnson saw Ross for follow up. (*Id.* at 404.) Johnson reported going to his appointment alone, playing basketball with his nephew at his local rec center, and continuing to write in his journal. (*Id.*)

On August 30, 2013, Johnson underwent an Initial Psychiatric Evaluation with Nurse Kimble. (*Id.* at 1692.) On examination, Kimble found Johnson well-groomed, with average eye contact and activity, clear speech, no delusions, auditory and visual hallucinations, logical thought process, euthymic and anxious mood, constricted affect, cooperative behavior, no impairment of orientation, memory, or attention/concentration, and paranoia. (*Id.* at 1693.) Kimble diagnosed Johnson with schizoaffective disorder, not otherwise specified, anxiety state not otherwise specified, and paranoid schizophrenia unspecified. (*Id.* at 1694.)

On September 12, 2013, Johnson saw Ross for follow up. (*Id.* at 406.) Johnson reported feeling much better about himself and his thoughts, and that he continued to express his thoughts and feelings in his journal. (*Id.*) Ross noted Johnson was improving. (*Id.* at 407.) On examination, Ross found appropriate appearance, orientation to person, tremors, pressured and monotone speech, labile affect, impaired long-term memory, below average intellect, cooperative and hopeful attitude, poor concentration, poor reasoning, poor impulse control, poor insight and judgment, blocked thought processes, and paranoid thought content. (*Id.*)

On September 26, 2013, Johnson saw Ross for follow up. (*Id.* at 401.) Johnson reported going to AA meetings, sometimes twice a day, and while at first he felt some anxiety, he was now comfortable being honest and sharing his feelings. (*Id.*) Johnson told Ross he wanted to see if he could volunteer at his local rec center. (*Id.*) Johnson also reported writing his feelings down in a journal, which he found

helpful.  (*Id.*)  On examination, Ross found appropriate appearance, full orientation, unremarkable behavior, soft and monotone speech, appropriate affect, anxious mood, impaired long-term memory, average intellect, cooperative and hopeful attitude, poor concentration, poor reasoning, poor impulse control, poor insight and judgment, blocked thought processes, and paranoid thought content.  (*Id.* at 402.)

On October 14, 2013, Johnson saw Ross for follow up.  (*Id.* at 464.)  Johnson reported walking around the track at his indoor rec center and that he was going to start tai chi.  (*Id.*)  On examination, Ross found appropriate appearance, full orientation, unremarkable behavior, soft and excessive speech, appropriate affect, depressed mood, impaired long-term memory, clouded consciousness, below average intellect, slow cognition, cooperative and hopeful attitude, poor concentration, although his attention was continuing to improve, poor reasoning, although it was continuing to improve, poor impulse control, very poor insight and judgment, incoherent thought processes, and paranoid thought content.  (*Id.* at 465.)

On October 18, 2013, Johnson saw Elaine Campbell, M.D., for medication management.  (*Id.* at 439.)  Johnson reported sadness, crying spells, occasional walks in the park, poor energy, poor motivation, poor concentration, variable appetite and sleep, no mania, and controlled anger.  (*Id.*)  Johnson did not want to increase his medication.  (*Id.*)  On examination, Dr. Campbell found neat appearance, soft speech, organized thought process, paranoid thought content, decreased auditory hallucinations, sad mood, mildly constricted affect, intact cognition, and fair insight/judgment.  (*Id.*)  Dr. Campbell continued Johnson's medication.  (*Id.*)

That same day, Dr. Campbell completed a mental capacity medical source statement.  (*Id.* at 437-38.)  Dr. Campbell opined Johnson could frequently maintain his appearance and occasionally follow work rules, use judgment, and manage funds/schedule.  (*Id.*)  Dr. Campbell opined Johnson could rarely

11

perform all other functions. (*Id.*)  In support, Dr. Campbell listed Johnson's diagnosis of schizoaffective disorder-depressed and stated Johnson was "unable to be in close proximity with people."  (*Id.* at 438.) Dr. Campbell noted that this was her first meeting with Johnson but that she reviewed his complete medical history.  (*Id.*)

On October 28, 2013, Johnson saw Ross for follow up and reported he had heard a voice that day telling him to push the people ahead of him in line out of the way.  (*Id.* at 467.)  Ross noted Johnson appeared "very calm" and that he had been going to all of his girlfriend's appointments.  (*Id.*)  Johnson's girlfriend reported he had done everything asked of him.  (*Id.*)

On November 21, 2013, Johnson saw Ross for follow up and reported he was feeling stronger going to places alone.  (*Id.* at 480.)  Johnson's diagnoses remained paranoid type schizophrenia, chronic state, depressive disorder, not elsewhere classified, and alcohol dependence syndrome.  (*Id.* at 481.)

On December 6, 2013, Johnson saw Dr. Campbell for follow up.  (*Id.* at 475-76.)  Johnson reported doing well and that he was compliant with his medication.  (*Id.* at 475.)  Johnson denied auditory hallucinations, although he remained "mildly paranoid," and his sleep was okay.  (*Id.*)

On December 18, 2013, Johnson saw Coleman for follow up.  (*Id.* at 493-94.)  Johnson reported consistent AA attendance and helping an older uncle.  (*Id.* at 493.)  Johnson told Coleman his girlfriend made sure he took his medications as needed and went with him to meetings.  (*Id.*)  Johnson brought his journal and was able to talk about his feelings.  (*Id.*)  On examination, Coleman found sleep problems due to back pain, appropriate appearance, full orientation, unremarkable behavior, pressured speech, appropriate affect, anxious mood, although Coleman noted Johnson appeared to be in a pleasant place at this time, impaired long-term memory, clouded consciousness, below average intellect, cooperative and

12

hopeful attitude, poor concentration, although his attention was continuing to improve, poor reasoning, although it was continuing to improve, poor impulse control, although it was continuing to improve, poor insight, although it continued to improve, poor judgment, blocked thought processes, loose associations, and thought content remarkable for ideas of reference and phobias.  (*Id.* at 494.)

On January 22, 2014, Johnson saw Ross for follow up.  (*Id.* at 502.)  Johnson reported he was helping his girlfriend care for a woman in their building and her toy poodle.  (*Id.*)  Johnson told Ross he knew he was getting better because he cared about others and wanted to help as much as he could.  (*Id.*)  Ross noted, "pt states [h]is medication is really helping him and he [is] not havening [sic] any feelings of lonely ness [sic] and he feels good about himself an[d] no voices."  (*Id.*)  Johnson reported he continued to see his psychiatrist, he never missed his AA meetings, and he continued to write in his journal.  (*Id.*)  On examination, Ross found appropriate appearance, full orientation, unremarkable behavior, pressured speech, appropriate affect, at ease and aware mood, impaired long-term memory, clouded consciousness, below average intellect, cooperative and hopeful attitude, poor concentration, although reading about his illness helped with attention, poor reasoning, although it was continuing to improve, poor impulse control, poor insight, poor judgment, blocked thought processes, loose associations, and thought content remarkable for flight of ideas and phobias.  (*Id.* at 503-04.)  Ross noted Johnson's mood and thoughts were improving.  (*Id.* at 503.)

On February 12, 2014, Johnson saw Ross for follow up.  (*Id.* at 510.)  Johnson reported feeling better and working on leading his AA meetings, although the amount of people made him a little nervous about that.  (*Id.*)  Johnson told Ross he "always" goes to his uncle's house to help him out.  (*Id.*)  Johnson

13

reported having started to go to church, which made him feel good.  (*Id.*)  Johnson continued to write in his journal.  (*Id.*)

On March 26, 2014, Johnson saw Ross for follow up.  (*Id.* at 520.)  Johnson reported his thoughts were improving, he continued to go to AA meetings at least three times a week, he was going to church now, and he felt better about life.  (*Id.*)  Johnson continued to write in his journal regularly and keep up with his appointments.  (*Id.*)

On April 9, 2014, Johnson saw Ross for follow up.  (*Id.* at 522.)  Johnson reported almost nine months of sobriety.  (*Id.*)  Johnson told Ross his depression came and went when he could not get his medication.  (*Id.*)  Johnson reported his mood swings had improved and he did not hide in the closet anymore.  (*Id.*)  Johnson had been helping his girlfriend care for her brother, who had recently had a stroke.  (*Id.*)  Johnson also reported going to see his uncle.  (*Id.*)  Johnson continued to write in his journal and keep his appointments.  (*Id.*)  On examination, Ross found appropriate appearance, full orientation, unremarkable behavior, pressured and excessive speech, expansive affect, impaired long-term memory, below average intellect, cooperative and hopeful attitude, poor concentration, reasoning, impulse control, insight, and judgment, although Johnson was working hard to improve these areas, blocked thought processes, and thought content remarkable for paranoia, ideas of reference, and phobias, although they were improving.  (*Id.* at 523.)

On April 23, 2014, Johnson saw Ross for follow up.  (*Id.* at 525.)  Johnson reported he had not felt this good mentally in years.  (*Id.*)  Johnson told Ross he had almost no mood swings, and he wrote in his journal every day.  (*Id.*)  Johnson reported he could now go to his AA meetings alone and he could take public transportation with help.  (*Id.* at 527.)  On examination, Ross found appropriate appearance, full

14

orientation, unremarkable behavior, appropriate speech, appropriate affect, impaired long-term memory, clouded consciousness, below average intellect, cooperative, hopeful, and "very positive" attitude, poor concentration, reasoning, impulse control, insight, and judgment, although Johnson was working hard to improve these areas, loose associations, blocked thought processes, and thought content remarkable for paranoia, compulsions, and phobias.  (*Id.* at 526-27.)

On May 7, 2014, Johnson saw Ross for follow up.  (*Id.* at 529.)  Johnson reported attending all his meetings, getting out and walking, helping his girlfriend with her brother who had mental health issues, and trying to volunteer at his local rec center.  (*Id.*)

On May 23, 2014, Johnson saw Dr. Campbell for medication management.  (*Id.* at 469-70.) Johnson reported reduced auditory hallucinations that could still be bothersome, and he planned to have a picnic for the holiday.  (*Id.* at 469.)  Dr. Campbell noted Johnson may have some paranoia, and he had a fair mood and flat affect.  (*Id.*)  On examination, Dr. Campbell found organized thought process, some paranoia, some auditory hallucinations, fair cognition, and fair insight/judgment.  (*Id.*)

On June 4, 2014, Johnson saw Ross for follow up and reported he was attending his AA meetings, he had very few depressed days now, he was not having as many mood swings, and he was looking to volunteer with the rec center.  (*Id.* at 548.)  Johnson also told Ross he had been helping his uncle out, including helping him with his bills.  (*Id.*)

On June 18, 2014, Johnson saw Ross for follow up.  (*Id.* at 551.)  Johnson reported sobriety for a year and that his drinking was part of his mental health issues.  (*Id.*)  Johnson told Ross his medication helped his depression and improved his mood swings.  (*Id.*)  Ross noted Johnson was very calm that day. (*Id.*)  Johnson reported helping his uncle, who needed someone to look out for him.  (*Id.* at 552.)  On

examination, Ross found appropriate appearance, full orientation, unremarkable behavior, appropriate speech, appropriate affect, impaired long-term memory, below average intellect, clouded consciousness, cooperative and hopeful attitude, directed attention, poor reasoning, impulse control, insight, and judgment, although Johnson was working hard to improve these areas, loose associations, blocked thought processes, and thought content remarkable for compulsions and phobias.  (*Id.* at 552-53.)

On July 9, 2014, Johnson saw Dr. Campbell for medication management.  (*Id.* at 592.)  Dr. Campbell noted no significant changes and that she had completed disability paperwork for Johnson.  (*Id.*)

That same day, Dr. Campbell completed a second mental capacity medical source statement.  (*Id.* at 556-57.)  Dr. Campbell opined Johnson could occasionally follow work rules, use judgment, respond appropriately to changes in routine settings, understand, remember, and carry out simple job instructions, maintain appearance, behave in an emotionally stable manner, and leave home on his own.  (*Id.*)  Dr. Campbell opined Johnson could rarely perform all other functions.  (*Id.*)   In support of these limitations, Dr. Campbell listed schizoaffective disorder, cognitive impairment, and psychotic symptoms.  (*Id.* at 557.)

On July 31, 2014, Johnson saw Ross for follow up.  (*Id.* at 566.)  Johnson reported going to AA meetings daily and helping out at them.  (*Id.*)  Johnson told Ross his mood swings were less frequent, and he stayed to himself when he felt them coming on.  (*Id.*)  Johnson was able to take the bus with his girlfriend to her office.  (*Id.*)  Ross noted Johnson's thoughts were improving and he was starting to feel good about himself.  (*Id.* at 567.)  On examination, Ross found appropriate appearance, full orientation, unremarkable behavior, soft and excessive speech, appropriate affect, anxious and depressed mood, impaired long-term memory, below average intellect, clouded consciousness, cooperative and hopeful attitude, poor concentration, reasoning, impulse control, insight, and judgment, loose associations, blocked

16

thought processes, and thought content remarkable for compulsions and phobias.  (*Id.* at 567-68.)  Ross noted Johnson reported he felt people looked at him strangely, but he did not acknowledge them.  (*Id.* at 568.)

On August 21, 2014, Johnson saw Ross for follow up.  (*Id.* at 576.)  Johnson reported helping his girlfriend with her brother, who had mental health issues, and making sure his girlfriend got on the bus on time.  (*Id.*)  Johnson loved his church, and he told Ross his depression was lifting more every day, he was learning to be more positive, his mood swings were less, and he was writing in his journal when he felt his mood swings coming on.  (*Id.*)  Ross noted Johnson's thought process was improving.  (*Id.* at 577.)  On examination, Ross found appropriate appearance, full orientation, unremarkable behavior, appropriate speech, appropriate affect, anxious mood, impaired long-term memory, below average intellect, clouded consciousness, cooperative and hopeful attitude, poor concentration, reasoning, impulse control, insight, and judgment, although Johnson was working hard to improve in these areas, loose associations, blocked thought processes, and thought content remarkable for ideas of reference and somatic preoccupations. (*Id.*)

On August 27, 2014, Johnson saw Dr. Campbell for medication management.  (*Id.* at 590.)  Dr. Campbell noted Johnson reported no significant change in his mental state, and that Johnson's girlfriend "note[d] much improvement in behavior."  (*Id.*)

On November 10, 2014, Johnson saw Dr. Campbell for medication management.  (*Id.* at 588.)  Dr. Campbell noted Johnson's psychotic symptoms remained improved.  (*Id.*)

That same day, Johnson met with Krystie Burt and reported he had been doing well until his sister died, and he had been depressed since then.  (*Id.* at 594.)

17

Later that month, Johnson met with Burt and reported feeling okay, although he was still getting a little depressed when he thought about his sister.  (*Id.* at 605.)  Johnson told Burt he was going to see his family and his girlfriend's family for Thanksgiving.  (*Id.*)

On April 13, 2015, Johnson saw Dr. Campbell for medication management.  (*Id.* at 1022.) Johnson and his sister reported Johnson was more tolerant of others and he was involving himself in family gatherings.  (*Id.*)  Johnson denied psychotic or mood issues and said he was sleeping well with his current dose of trazadone.  (*Id.*)

On May 13, 2015, Johnson saw Amber Davis for therapy.  (*Id.* at 942.)  Davis noted Johnson had made some progress.  (*Id.*)  Johnson reported a stable mood that only varied with circumstantial stressors, medication compliance with positive results, and intermittent auditory hallucinations.  (*Id.*)  Walking helped calm his fear and nervousness.  (*Id.*)  Davis found notable changes in mood/affect, with a stable mood and few occasional ruminations, thought process/orientation, with future-oriented and goal-directed thoughts, motor activity, and speech, with pressured speech, and behavior functioning, with daily goal-directed functioning and behavior.  (*Id.*)  Davis further found intermittent eye contact, stereotyped/peculiar activity, anxious attitude, anxious mood, flat affect, pressured speech, circumstantial and concrete thought process, normal thought content, average intelligence, partial insight, and normal judgment.  (*Id.* at 943.)

On June 8, 2015, Johnson saw Dr. Campbell for medication management.  (*Id.* at 1024.)  Johnson reported increased auditory hallucinations and paranoia, increased depression, isolation, low energy, low concentration, poor appetite, and poor sleep.  (*Id.*)  On examination, Dr. Campbell found normal appearance and demeanor, avoidant eye contact, slowed activity, normal speech, full orientation, logical thought process, depressed mood, constricted affect, cooperative behavior, normal cognition, average

18

intellect, and fair insight and judgment.  (*Id.* at 1025.)  Dr. Campbell increased Johnson's Risperdal and Zoloft.  (*Id.* at 1026.)

On July 20, 2015, Johnson saw Dr. Campbell for medication management and reported his increased medication dosages had calmed him down, decreased his auditory hallucinations, increased his tolerance for attending band festivals, and improved his ability to play with his younger relatives.  (*Id.* at 1027.)

On April 12, 2016, Johnson saw Dr. Campbell for medication management and reported his medications continued to calm him down and reduce his auditory hallucinations.  (*Id.* at 1037.)  Johnson told Dr. Campbell he tended to wake up in the middle of the night and walk around his building.  (*Id.*)  Johnson reported reducing his fear of the dark.  (*Id.*)  Dr. Campbell noted no significant changes.  (*Id.*)

On June 8, 2016, Johnson saw Davis for follow up.  (*Id.* at 973.)  Davis noted Johnson had made some progress and found notable changes in mood/affect, with a pleasant, cooperative mood and flat affect, thought process/orientation, with poverty of content and very concrete thoughts, motor activity/speech, with both being within normal limits, and behavior/functioning, with goal-driven behavior and productive daily functioning with the supervision and guidance of his girlfriend, who had power of attorney.  (*Id.* at 973-74.)  Davis further found normal appearance, intermittent eye contact, blocked and slowed thought process, preoccupations/ruminations in thought content, borderline intelligence, minimal insight, and mild impairment in judgment.  (*Id.* at 974.)

On June 21, 2016, Johnson saw Laurie Mandel, APN, for medication management.  (*Id.* at 1039.)  Johnson reported hearing voices sometimes at night that told him to take a walk, occasionally locking himself in the closet, and hearing voices telling him to beat up other people.  (*Id.*)  Mandel recommended

19

Johnson see a neurologist for evaluation of memory deficits.  (*Id.*)  On examination, Mandel found normal appearance, withdrawn demeanor, avoidant eye contact, normal activity, full orientation, concrete and blocked thought processes, irritable mood, constricted affect, withdrawn behavior, memory loss, average intellect, and fair insight and judgment.  (*Id.* at 1040-41.)  Mandel noted Johnson was unsure of the year or the name of the facility, had limited speech, and was very quiet.  (*Id.* at 1041.)

On July 19, 2016, Johnson saw Barbara Wiseley-Cortland, APN, for medication management.  (*Id.* at 1042.)  Johnson reported his fiancée took care of his medication.  (*Id.*)  Johnson could not remember where his children lived, and he did not know the year or the president.  (*Id.*)  Johnson's fiancée reported a marked improvement since starting his medications, but she was worried about his safety while she was at work and was trying to get a caregiver in with him when she was gone.  (*Id.*)  Johnson also told Wiseley-Cortland he continued to hear voices.  (*Id.*)  On examination, Wiseley-Cortland found well-groomed appearance, withdrawn demeanor, avoidant eye contact, slowed activity, aphasic speech, orientation to person and situation, concrete thought process, normal thought content, depressed mood, constricted affect, cooperative behavior, average intellect, fair insight, and poor judgment.  (*Id.* at 1043-44.)  Wiseley-Cortland noted Johnson relied on his fiancée for his emotional and mental health needs.  (*Id.* at 1044.)

On August 9, 2016, Tunisia Torres met with Johnson and his fiancée during a home visit.  (*Id.* at 1053.)  Torres noted that Johnson's fiancée answered the majority of the questions and completed paperwork, while Johnson spoke in a low tone with low cognitive functioning.  (*Id.* at 1054.)  Johnson reported continued auditory and visual hallucinations and he coped with his fiancée's help.  (*Id.*)  Johnson told Torres he was not comfortable going anywhere without his fiancée.  (*Id.*)

20

On September 13, 2016, Johnson saw Wiseley-Cortland for medication management.  (*Id.* at 1045.)  Wiseley-Cortland noted Johnson appeared fidgety and got out of his chair several times, and prescribed Cogentin as needed for days when he was fidgety.  (*Id.*)  Johnson's fiancée reported Johnson had many days when he was not fidgety, and this medication regimen worked best for him.  (*Id.*)

On October 4, 2016, Johnson saw John Kuruvilla, M.D., for evaluation of memory loss.  (*Id.* at 1063.)  Dr. Kuruvilla noted Johnson could not provide a detailed history and spoke very little.  (*Id.*)  Johnson's fiancée told Dr. Kuruvilla that Johnson had schizophrenia and anxiety, and he had become less communicative recently.  (*Id.*)  Dr. Kuruvilla found Johnson oriented to person and place, although he did not know the month or year, intact speech, normal language, mild ataxia, and memory loss, although it was difficult to test Johnson's memory since he said he couldn't remember anything.  (*Id.* at 1063-64.)  Dr. Kuruvilla suspected Johnson's schizophrenia was the primary reason for his cognitive dysfunction but would order the appropriate tests to rule out treatable causes of dementia.  (*Id.* at 1064.)

On December 8, 2016, Johnson saw Wiseley-Cortland for medication management.  (*Id.* at 1102.)  Johnson reported Cogentin helped but he had run out, he continued to get mood swings that caused him to be irritable with others, and his medications calmed him down.  (*Id.*)

On January 12, 2017, Johnson saw Rimvydas Augis, Ph.D., for therapy.  (*Id.* at 1098.)  Dr. Augis noted Johnson was shy and inhibited, especially at the beginning of the session, and was reluctant to talk, although he eventually became more relaxed and reported hearing voices and seeing people.  (*Id.*)  Johnson reported hearing voices that tell him to walk or hit people.  (*Id.*)  He had trouble sleeping and got confused, and his fiancée put a double lock on the door.  (*Id.*)  Johnson slept during the day, enjoyed

21

watching cartoons and the animal channel, and sometimes saw people, including his deceased mother. (*Id.*)

On May 1, 2017, Johnson saw Wiseley-Cortland for medication management.  (*Id.* at 1642.)  Johnson's fiancée reported Johnson had wandered out of their apartment the night before and they found him confused on the eighth floor.  (*Id.*)  Johnson's doctor referred him to a neurologist.  (*Id.*)  The property management office was going to put a lock on the door so Johnson could not get out.  (*Id.*)  Wiseley-Cortland continued Johnson's medication.  (*Id.* at 1643.)

That same day, Wiseley-Cortland completed a mental capacity medical source statement.  (*Id.* at 1136.)  Wiseley-Cortland opined Johnson had marked limitations in his abilities to follow one or two step oral instructions to carry out a task, ask and answer questions and provide explanations, cooperate with others, respond to demands, and maintain personal hygiene and attire appropriate to a work setting.  (*Id.* at 1137.)  Wiseley-Cortland opined Johnson had extreme limitations in all other abilities.  (*Id.* at 1136-37.)  In support of these opinions, Wiseley-Cortland listed Johnson's schizoaffective disorder and unspecified anxiety disorder, that he depended on his wife for daily care, and that he had difficulty participating in his treatment independently.  (*Id.* at 1137.)

On June 7, 2017, Johnson saw Wiseley-Cortland for medication management.  (*Id.* at 1645.)  Johnson reported his mood was not too good, he felt passive suicidal ideation but no plan or intent, and there were no guns in the house.  (*Id.*)  Wiseley-Cortland increased Johnson's Zoloft.  (*Id.* at 1646.)

On August 12, 2017, Johnson saw Wiseley-Cortland for medication management.  (*Id.* at 1647.)  Johnson reported he had not seen a neurologist because of Caresource problems with the Cleveland Clinic, and that he would make an appointment elsewhere.  (*Id.*)  Johnson told Wiseley-Cortland he still heard

22

voices, mainly at night, but they did not keep him awake.  (*Id.*)  Wiseley-Cortland noted Johnson provided responses in few words and that he showed some confusion.  (*Id.*)  Wiseley-Cortland continued Johnson's medication.  (*Id.*)

On October14, 2017, Johnson saw Wiseley-Cortland for medication management.  (*Id.* at 1650.)  Johnson reported he was still hearing voices that were intrusive, especially at night, and he was taking his medication as ordered and had not run out.  (*Id.*)  Johnson's wife accompanied him and reminded him to take his medication.  (*Id.*)  Wiseley-Cortland increased Johnson's Risperdal.  (*Id.* at 1651.)

On November 18, 2017, Johnson saw Wiseley-Cortland for medication management.  (*Id.* at 1653.)  Wiseley-Cortland noted Johnson was there on his own.  (*Id.*)  Johnson reported he was taking medication as ordered, his sleep and appetite were okay, and his mood had been "on and off."  (*Id.*)  On examination, Wiseley-Cortland found full orientation, adequate appearance, cooperative attitude, good eye contact, adequate attention and concentration, clear speech with normal rate and volume, concrete thought processes, normal associations, mild auditory hallucinations, intact recent and remote memory, and fair insight and judgment.  (*Id.* at 1654-55.)

On February 3, 2018, Wiseley-Cortland found similar findings on examination.  (*Id.* at 1660-61.)

On May 25, 2019, Johnson saw Shanna Swaringen, D.O., to transfer care from Wiseley-Cortland.  (*Id.* at 1790-91.)  Dr. Swaringen noted Johnson had a "very poor memory, limited orientation, [and] limited ability to provide any history."  (*Id.* at 1790.)  Johnson had not seen Wiseley-Cortland since February 2018 and had run out of his medication in February 2019.  (*Id.*)  Johnson reported not doing well since running out of his medication.  (*Id.*)  Johnson endorsed feeling depressed all the time, hearing voices, seeing things that weren't there, and feeling anxious about hurting other people.  (*Id.*)  On

23

examination, Dr. Swaringen found orientation to person but not place or situation, limited attention and concentration, dysphoric mood, irritable affect, fluent speech, goal-directed thought process, logical associations, auditory and visual hallucinations, paranoia, limited fund of knowledge, limited recent and remote memory, and limited judgment and insight.  (*Id.* at 1788-89.)  Dr. Swaringen restarted Johnson's medication.  (*Id.* at 1791.)

That same day, Dr. Swaringen completed a mental capacity medical source statement.  (*Id.* at 1784-85.)  Dr. Swaringen opined Johnson had moderate limitations in his abilities to cooperate with others, understand and respond to social cues, and initiate and perform a task that he understands and knows how to do.  (*Id.*)  Dr. Swaringen further opined Johnson had marked limitations in his abilities to understand and learn terms, instructions, or procedures, follow one or two step oral instructions to carry out a task, ask and answer questions and provide explanations, ask for help when needed, initiate or sustain conversation, set realistic goals, and maintain personal hygiene and attire appropriate to a work setting.  (*Id.*)  Dr. Swaringen further opined Johnson had extreme limitations in all other abilities.  (*Id.*)  In support, Dr. Swaringen listed Johnson's diagnoses of schizoaffective disorder, generalized anxiety, and neurocognitive disorder, as well as his moderate intellectual ability, and noted Johnson could not read or write, had poor working memory, was unable to remember three words for two minutes, and was not oriented to place or date.  (*Id.* at 1785.)

On January 27, 2020, Johnson saw Charles Carlson, D.O., for medication management.  (*Id.* at 1853.)  Dr. Carlso noted very poor memory, limited orientation, and limited ability to provide any history at baseline.  (*Id.* at 1857.)  Johnson reported continuing to have constant auditory hallucinations that had not gotten worse, and his mood over the past month had been good or down depending on the situation.

(*Id.* at 1858.) Johnson told Dr. Carlson his mood had not improved since increasing Zoloft. (*Id.*) Johnson and his wife did not want to change his medications. (*Id.*) On examination, Dr. Carlson found Johnson alert and oriented with okay eye contact, calm and cooperative attitude, poor attention and concentration, okay mood, restricted range of affect that was stable and congruent to mood, with limited reactiveness, slow speech with low volume, slowed but organized and linear thought process, logical associations, no hallucinations, no delusions, limited recent and remote memory, and questionable judgment and insight. (*Id.* at 1855-56.)

On April 25, 2020, Dr. Carlson completed a mental capacity medical source statement. (*Id.* at 1859-60.) Dr. Carlson opined Johnson had a mild limitation in his ability to initiate and perform a task that he understands and knows how to do and moderate limitations in his abilities to cooperate with others and understand and respond to social cues. (*Id.*) Dr. Carlson further opined Johnson had marked limitations in his abilities to understand and learn terms, instructions, or procedures, follow one or two step instructions to carry out a task, ask and answer questions and provide explanations, ask for help when needed, initiate or sustain conversation, set realistic goals, and maintain personal hygiene and attire appropriate in a work setting. (*Id.*) Dr. Carlson further opined Johnson had extreme limitations in all other abilities. (*Id.*) Dr. Carlson noted Johnson had seen multiple providers since at least April 2015. (*Id.* at 1860.) In support of his opinions, Dr. Carlson stated that Johnson's diagnosis of schizoaffective disorder could substantially limit life activities as mentioned above compared to most people in the general population. (*Id.*)

25

**C.      State Agency Reports**

On August 2, 2013, Tonnie Hoyle, Psy.D., opined Johnson had moderate limitations in his activities of daily living and his ability to maintain concentration, persistence, or pace and a marked limitation in maintaining social functioning.  (*Id.* at 73, 90.)  Dr. Hoyle further opined Johnson was capable of performing simple one to two step tasks, could perform tasks in an environment where he was not required to meet strict production goals or demands, he should have no interaction with the general public and interactions with coworkers and supervisors should be occasional and superficial, and changes should be infrequent and thoroughly explained.  (*Id.* at 75-76, 92-93.)

On September 18, 2013, on reconsideration, Karen Steiger, Ph.D., found Johnson had moderate limitations in his activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace.  (*Id.* at 105, 119.)  Dr. Steiger affirmed Dr. Hoyle's other findings.  (*Id.* at 107-08, 121-22.)

On September 27, 2018, Robyn Murry-Hoffman, Ph.D., opined Johnson had moderate limitations in his abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself.  (*Id.* at 1285.)     Dr. Murry-Hoffman adopted the MRFC findings from the ALJ decision dated October 17, 2017.  (*Id.* at 1287.)

On December 18, 2018, on reconsideration, Todd Finnerty, Psy.D., affirmed Dr. Murry-Hoffman's findings.  (*Id.* at 1300, 1302.)

**D.      Hearing Testimony**

During the April 24, 2020 hearing, Johnson testified to the following:

26

- His caregiver, Linda, takes care of him. (*Id.* at 1219.) She handles his medications. (*Id.*) She was beside him at the hearing. (*Id.* at 1220.) She speaks on his behalf and makes sure he eats and goes to his doctor appointments. (*Id.*) He did not understand the questions because he is on medication. (*Id.* at 1222.)

- He graduated from high school. (*Id.* at 1227.) He did not have a license and did not drive. (*Id.*) He cannot work because of his schizophrenia. (*Id.* at 1229.) He cannot be around people and he hears things. (*Id.* at 1230.) He sometimes takes a walk with Linda. (*Id.*) He is not in contact with his family. (*Id.*) The only person he can be around is Linda. (*Id.*) He does not cook. (*Id.* at 1231.) He cannot do anything because he is handicapped. (*Id.*) Linda makes sure he gets to the bathroom. (*Id.* at 1232.) Linda does the laundry and bathes him. (*Id.*) Linda is with him all the time. (*Id.* at 1234.) If he goes grocery shopping, Linda goes with him. (*Id.*)

- On a typical day, he wakes up and has breakfast. (*Id.* at 1232.) He watches TV with Linda and they talk about getting a puppy. (*Id.*) They walk and go to the park. (*Id.* at 1233.) They watch more TV. (*Id.*) Sometimes he feeds the birds. (*Id.*)

- He cannot remember anything. (*Id.* at 1235.) He sleeps well because of a sleeping pill from his doctor. (*Id.*)

The ALJ found Johnson had past relevant work as a kitchen helper and cleaner. (*Id.* at 1229.) The ALJ then posed the following hypothetical question:

> So, I'm going to ask that you please assume an individual of the claimant's age, education and work experience. And, if you could please assume that this hypothetical individual has the capacity to understand and remember directions for simple tasks. He or she has the capacity to perform these simple tasks in an environment without the requirement to meet strict production goals.
>
> He or she has the capacity to work where interactions of coworkers are occasional and superficial and there are no interactions with the general public. This individual has the capacity to work where changes are infrequent and thoroughly explained. With these limitations and the ability, could you please advise is [sic] such an individual would be able to perform the claimant's past work?

(*Id.* at 1239.)

The VE testified the hypothetical individual would be able to perform Johnson's past work as a kitchen helper and cleaner.  (*Id.* at 1240.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as laundry worker, groundskeeper, and warehouse worker.  (*Id.*)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the

28

disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Johnson was insured on his alleged disability onset date, February 2, 2011, and remained insured through December 31, 2013, his date last insured ("DLI"). (Tr. 1174-75.) Therefore, in order to be entitled to POD and DIB, Johnson must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

29

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since February 2, 2011, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: depressive, bipolar and related disorders (depressive disorder not elsewhere classified), alcohol, substance addiction disorder (alcohol dependence syndrome), schizophrenia spectrum and other psychotic disorder (schizoaffective disorder, bipolar type; paranoid schizophrenia unspecified; psychotic disorder not otherwise specified), intellectual disorder (borderline intellectual functioning), and anxiety and obsessive-compulsive disorder (anxiety disorder unspecified; anxiety state not otherwise specified) (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: has the capacity to understand and remember directions for simple tasks; has the capacity to perform these simple tasks in an environment without the requirements to meet strict production goal demands; has the capacity to work where interactions with coworkers and supervisors are occasional and superficial, and there are no interactions with the general public; has the capacity to work where changes are infrequent and thoroughly explained.

6.  The claimant is capable of performing past relevant work as a kitchen helper and cleaner. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from February 2, 2011, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 1177-1203.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because

31

there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.     First Assignment of Error: Medical Opinions**

**1.     Dr. Campbell**

Johnson argues the ALJ erred in "refusing to accept" the 2013 and 2014 opinions of treating physician Dr. Campbell.  (Doc. No. 9 at 26.)  Johnson argues the two opinions are consistent with each other, and while the 2013 opinion was rendered after Dr. Campbell's first meeting with Johnson, "she had reviewed his complete medical history."  (*Id.* at 27.)  Johnson challenges the reasons the ALJ provided for the weight assigned to Dr. Campbell's opinions, and maintains that "[c]ontrary to the ALJ's finding, the medical records from Dr. Campbell support the severity of Plaintiff's work limitations."  (*Id.* at 26-29.)

The Commissioner responds that the ALJ "reasonably assigned little weight" to Dr. Campbell's opinions.  (Doc. No. 12 at 13-17.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c),[4] and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than

---

[4] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.* In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Social Security Ruling ("SSR") 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).[5]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2). However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188, at *4 (SSA July 2, 1996)).[6] Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion

---

[5] SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* SSA 17-2p, 2017 WL 3928306, at *1 (SSA Mar. 27, 2017).

[6] SSR 96-2p has been rescinded. This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298, at *1.

[7] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188, at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[8]

---

[8] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. §§ 404.1527(c), 416.927(c). Other factors 'which tend to

35

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

The ALJ weighed the opinions of Dr. Campbell as follows:

> The claimant's psychiatrist, Elaine Campbell, M.D., opined on October 18, 2013 that the claimant can rarely maintain attention and concentration for extended periods of 2 hour segments, respond appropriately to changes in routine settings, maintain regular attendance and be punctual within customary tolerances, deal with the public, relate to coworkers, interact with supervisors, function independently without redirection, work in coordination with or proximity to others without being distracted, work in coordination with or proximity to others without being distracting, deal with work stress, complete a normal workday and workweek, understand, remember, and carry out complex job instructions, understand, remember, and carry out detailed but not complete

---

support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id*. § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

jobs instructions, understand, remember, and carry out simple job instructions, socialize, behave in an emotionally stable manner, relate predictably in social situations, and leave home on his own (Exhibit 8F). Dr. Campbell indicated the claimant can occasionally follow work rules, use judgment, and manage funds/schedules, and frequently maintain appearance (Id.). In support of her opinion, Dr. Campbell noted a diagnosis of schizoaffective disorder, depressed, and inability to be in close proximity with people (*Id.*).

Pursuant to the rules at issue in this case, a treating physician's medical opinion on the issue of the nature and severity of an impairment is entitled to special significance and, when supported by objective medical evidence of record, is entitled to controlling weight (20 CFR 404.1527(c)(2) and 416.927(c)(2)). However, in this case, Dr. Campbell's opinion does not warrant controlling, or even great weight, for several reasons. First, the opinion, rendered on a preprinted, check the box form, is inadequately supported, given the extremely sparse narrative discussion of the claimant's diagnoses and symptoms contained therein (See Exhibit 8F/2). In addition, it is noteworthy that Dr. Campbell rendered the opinion on the day she first began treating the claimant, at which time examination revealed soft speech, paranoid thought content, a sad mood, and mildly constricted affect, but neat dress and grooming, organized thought processes, reportedly decreased hallucinations, intact cognition, fair insight and judgment, and no suicidal or homicidal ideation (Exhibit 9F/1). In addition, the opinion is inconsistent with the remaining evidence of record, including subsequent behavioral health treatment notes from Dr. Campbell and other providers, which confirms persistent mood and affect abnormalities, impaired orientation, slowed activity, blocked, concrete thought processes, limited attention and concentration, baseline poor memory, limited fund of knowledge, and impaired insight and judgment, but normal appearance and demeanor, logical, organized, linear thought processes at times, appropriate language, normal associations, no overt psychosis, and no suicidal or homicidal ideation on examinations (Exhibit 11F, 17F, 18F, 23F, 27F, 33F, 34F, 35F, 41F, 45F). In addition, the extremely restrictive opinion is inconsistent with the indications of more extensive daily activities than alleged by the claimant, which have included doing simple cooking tasks for himself, attending AA, playing basketball with his nephew at a rec center, writing in a journal, going places alone, helping an older uncle, which has included assistance with managing his finances, helping an ill friend, including helping care for her pet dog, going to church, using public transportation and provide-a-ride transportation service, at times independently, and attending band festivals (Exhibit 5F; 7F/6; 12F/4, 17, 26, 34, 53, 72; 16F/8; 23F/10). Given this evidence, I give Dr. Campbell's opinion little, rather than great or controlling weight.

37

Dr. Campbell opined on July 9, 2014 that the claimant can rarely maintain attention and concentration for extended periods of 2 hour segments, maintain regular attendance and be punctual within customary tolerances, deal with the public, relate to coworkers, interact with supervisors, function independently without redirection, work in coordination with or proximity to others without being distracted, work in coordination with or proximity to others without being distracting, deal with work stress, complete a normal workday and workweek, understand, remember, and carry out complex job instructions, understand, remember, and carry out detailed but not complete jobs instructions, socialize, and relate predictably in social situations (Exhibit 14F). Dr. Campbell opined the claimant can occasionally follow work rules, use judgment, respond appropriately to changes in routine settings, understand, remember, and carry out simple job instructions, maintain appearance, behave in an emotionally stable manner, and leave home on his own (*Id.*). In support of her opinion, Dr. Campbell noted a diagnosis of schizoaffective disorder with psychotic symptoms (*Id.*).

This opinion, also rendered on a pre-printed, check the box form, likewise warrants little, rather than great or controlling weight (*Id.*). First, the opinion, like the foregoing one, is inadequately supported, as it contains very little by way of narrative discussion of the claimant's diagnoses or symptoms (*Id.*). In addition, the opinion is inadequately supported by Dr. Campbell's own treatment notes, which contain evidence of limited orientation, avoidant eye contact, withdrawn demeanor, slowed activity, occasional aphasia, an abnormal mood and affect, blocked, concrete thought processes, and impaired judgment, but normal appearance, otherwise normal demeanor and speech, normal thought content, average intellect, fair insight, and no suicidal or homicidal ideation (Exhibit 11F, 17F, 23F). In addition, the opinion is not entirely consistent with the remaining evidence of record, including recent examination findings of limited orientation, abnormal mood and affect, slow speech, baseline poor memory, and limited attention, concentration, fund of knowledge, insight, and judgment, but normal alertness, calm, cooperative demeanor/behavior, adequate eye contact, good grooming and hygiene, appropriate language, slowed, but organized, linear, goal-directed thought processes, logical associations, no overt psychosis, and no suicidal or homicidal ideation (Exhibit 41F, 45F). Finally, the extremely restrictive opinion is inconsistent with the indications of record of more extensive activities of daily living than reported by the claimant, which have included doing simple cooking tasks for himself, attending AA, playing basketball with his nephew at a rec center, writing in a journal, going places alone, helping an older uncle, which has included assistance with managing his finances, helping an ill friend, including helping care for her pet dog, going to

38

church, using public transportation and provide-a-ride transportation service, at times independently, and attending band festivals (Exhibit 5F; 7F/6; 12F/4, 17, 26, 34, 53, 72; 16F/8; 23F/10). For these reasons, I give Dr. Campbell's opinion little, rather than great or controlling weight.

(Tr. 1195-96.)

First, as the Commissioner correctly points out, the ALJ explicitly recognized Dr. Campbell as a treating source.[9] (*Id.*)  *Cf. Johnson v. Comm'r of Soc. Sec.*, Case No. 1:20cv156, 2021 WL 1214795, at *1 (N.D. Ohio Mar. 31, 2021) (ALJ identified treating source as state agency consultant and did not credit the treating source's assessment of the claimant's mental health).

Second, as the ALJ noted, Dr. Campbell's opinions were check-box forms that lacked any reference to specific treatment notes, diagnostic testing, or other objective findings to support the limitations set forth in the opinions.  The Sixth Circuit has discounted "check-box analysis" as "weak evidence at best," particularly when it is not accompanied by any supportive findings or records.  *See Shepard v. Comm'r of Soc. Sec.,* 705 F. App'x 435, 441 (6th Cir. Sept. 26, 2017); *see also Hernandez v.*

---

[9] Although the ALJ recognized Dr. Campbell as a "treating source," the Court has some doubt as to whether she qualified as such for purposes of her 2013 opinion under Social Security regulations.  A treating source must have "an ongoing treatment relationship with" the claimant, and the frequency of treatment must be "consistent with accepted medical practice" for the claimant's condition.  20 C.F.R. § 404.1502.  *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. July 13, 2015).  Precedent in this Circuit suggests a physician who treats an individual only twice or three times does not constitute a treating source.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506–07 (6th Cir. 2006) ("Depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship"); *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016); *Mireles ex rel. S.M.M. v. Comm'r of Soc. Sec.*, 608 F. App'x 397, 398 (6th Cir. 2015); *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1000–01 n. 3 (6th Cir. 2011.)  *See also Fleischer v.*, 774 F. Supp. 2d 875, 879 (N.D. Ohio 2011); *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n .16 (W.D. Mich.2008); *Carter v. Berryhill*, 2017 WL 2544064, at * 9 (N.D. Ohio May 26, 2017); *Witnik v. Colvin*, 2015 WL 691329, at * 7 (N.D. Ohio Feb. 18, 2015).  Here, the record reflects Dr. Campbell treated Johnson only one time before issuing the 2013 opinion.  (Tr. 438.)  Thus, it is questionable whether she qualified as a "treating source" at the time she authored her 2013 opinion.

*Comm'r of Soc. Sec.,* 644 F. App'x 468, 474-475 (6th Cir. Mar. 17, 2016); *Ellars v. Comm'r of Soc. Sec.,* 647 F. App'x 563, 566 (6th Cir. May 6, 2016)("Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's 'check-off form' of functional limitations that 'did not cite clinical test results, observations, or other objective findings . . . '"). While Johnson points to medical evidence he argues supports Dr. Campbell's opinions, Dr. Campbell did not do so. *See Price v. Comm'r of Soc. Sec. Admin.*, 342 F. App'x 172, 176 (6th Cir. 2009) ("Because Dr. Ashbaugh failed to identify objective medical findings to support his opinion regarding Price's impairments, the ALJ did not err in discounting his opinion.") (citations omitted). *See also Buxton*, 246 F.3d at 773 ("[T]he ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.'") (citation omitted).

The ALJ considered and weighed the medical opinion evidence of record and provided an explanation for the weight assigned. The ALJ determined that Dr. Campbell's opinions were inconsistent with Johnson's reported functioning, Dr. Campbell's own treatment notes, and other objective evidence in the record, citing specific examples. (*Id.* at 1195-96.) It is the ALJ's duty, not this Court's, to weigh the evidence and resolve any conflicts, and she did so here.

Although Johnson cites evidence from the record he believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton*, 246 F.3d at 772-73. Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance

40

of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no error in the ALJ's evaluation of Dr. Campbell's opinions.

### 2.  Dr. Swaringen, Dr. Carlson, and Nurse Wiseley-Cortland

Johnson argues the ALJ further erred "in according little weight to the medical opinions of Drs. Swaringen, Carlson, and Nurse Wiseley-Cortland."  (Doc. No. 9 at 29.)  Johnson asserts, "The ALJ's rationale took a myopic, dis-aggregate approach, and neglected to review that [sic] the records as a whole."  (*Id.*)  Johnson maintains these medical opinions were "consistent with each other and the other findings and treatment of record."  (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's reasoning for the weight assigned to the opinions of Drs. Swaringen and Carlson, as well as Nurse Wiseley-Cortland.  (Doc. No. 12 at 18.)

The ALJ weighed and analyzed the opinions of Drs. Swaringen and Carlson, as well as Nurse Wiseley-Cortland, as follows:

> The claimant's medical source Barbara Wiseley-Cortland, MSN, APRN-BC, opined on May 1, 2017 that the claimant experiences extreme limitations regarding his ability to understand and learn terms, instructions, or procedures, describe work activity to someone else, recognize a mistake and correct it, identify and solve problems, sequence multi-step activities, use reason and judgment to make work related decisions, ask for help when needed, handle conflicts with others, state own point of view, initiate or sustain conversation, understand and respond to social cues, respond to requests, suggestions, criticism, correction, and challenges, keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness, initiate and perform a task that he understands and knows how to do, work at an appropriate and consistent pace, complete tasks in a timely manner, ignore or avoid distractions while working, change activities or work settings without being

41

disruptive, work close to or with others without interrupting or distracting them, sustain an ordinary routine and regular attendance at work, work a full day without needing more than the allotted number or length of rest periods during the day, adapt to changes, manage one's psychologically based symptoms, distinguish between acceptable and unacceptable work performance, set realistic goals, make plans for oneself independently of others, and be aware or normal hazards and take appropriate precautions (Exhibit 30F). Ms. Wiseley-Cortland noted marked limitations regarding the claimant's ability to follow 1 or 2 step oral instructions to carry out a task, ask and answer questions and provide explanations, cooperate with others, respond to demands, and maintain personal hygiene and attire appropriate to a work setting (*Id.*). In support of her opinion, she noted diagnoses of schizoaffective disorder, bipolar type, and unspecified anxiety disorder, with treatment at their facility since 2012 (*Id.*). Ms. Wiseley-Cortland also noted dependence on a caregiver/wife for daily care, and noted difficulties with participating in treatment independently (*Id.*).

Although Ms. Wiseley-Cortland is a treating mental health provider, she is not a licensed psychiatrist, psychologist, or physician, and thus her opinion is not entitled to controlling weight (See 20 CFR 404.15237 and 416.927). In this case, her opinion warrants little, rather than great weight, for several reasons. First, the opinion is inconsistent with Ms. Wiseley-Cortland's own treatment notes, which contain evidence of fidgeting, concrete thought processes, and reportedly mild auditory hallucinations, but normal alertness and orientation, adequate appearance, cooperative attitude, good eye contact, adequate attention and concentration, okay mood and affect, normal speech, adequate language, normal associations, fair fund of knowledge, intact memory, and fair insight and judgment, and no suicidal or homicidal ideation on examinations (Exhibit 27F, 33F, 34F, 35F). In addition, the opinion is not entirely consistent with the remaining evidence of record, including recent examination findings of limited orientation, abnormal mood and affect, slow speech, baseline poor memory, and limited attention, concentration, fund of knowledge, insight, and judgment, but normal alertness, calm, cooperative demeanor/behavior, adequate eye contact, good grooming and hygiene, appropriate language, slowed, but organized, linear, goal-directed thought processes, logical associations, no overt psychosis, and no suicidal or homicidal ideation (Exhibit 41F, 45F). Finally, the extremely restrictive opinion is inconsistent with the indications of record of more extensive activities of daily living than reported by the claimant, which have included doing simple cooking tasks for himself, attending AA, playing basketball with his nephew at a rec center, writing in a journal, going places alone, helping an older uncle, which has included assistance with managing his finances, helping an ill friend, including helping care for her pet dog, going to

42

church, using public transportation and provide-a-ride transportation service, at times independently, and attending band festivals (Exhibit 5F; 7F/6; 12F/4, 17, 26, 34, 53, 72; 16F/8; 23F/10). For these reasons, I give Ms. Wiseley-Cortland's opinion little weight.

Shanna Swaringen, D.O., of Signature Health, opined on May 25, 2019 that the claimant experiences extreme limitations regarding his ability to describe work activity to someone else, recognize a mistake and correct it, identify and solve problems, sequence multi-step activities, use reason and judgment to make work related decisions, handle conflicts with others, state own point of view, respond to requests, suggestions, criticism, correction, and challenges, keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness, work at an appropriate and consistent pace, complete tasks in a timely manner, ignore or avoid distractions while working, change activities or work settings without being disruptive, work close to or with others without interrupting or distracting them, work a full day without needing more than the allotted number or length of rest periods during the day, respond to demands, adapt to changes, manage one's psychologically based symptoms, distinguish between acceptable and unacceptable work performance, make plans for oneself independently of others, and be aware of normal hazards and take appropriate precautions (Exhibit 40F). Dr. Swaringen noted marked limitations related to the claimant's ability to understand and learn terms, instructions, or procedures, follow 1 or 2 step oral instructions to carry out a task, ask and answer questions and provide explanations, ask for help when needed, initiate or sustain conversation, set realistic goals, and maintain personal hygiene and attire appropriate to a work setting (*Id.*).

She noted moderate limitations related to the claimant's ability to cooperate with others, understand and respond to social cues, and initiate and perform a task that he understands and knows how to do (*Id.*). In support of her opinion, Dr. Swaringen noted diagnoses of schizoaffective disorder, generalized anxiety, and neurocognitive disorder, with symptoms including hearing voices, visual hallucinations, paranoia, and mood disturbance (*Id.*). Dr. Swaringen also noted moderate intellectual disability, with inability to read or write, poor working memory, as the claimant is unable to remember three words for two minutes, and impaired orientation (*Id.*). However, Dr. Swaringen admitted today was the first day she met the claimant, as he had undergone treatment with another provider since 2016 (*Id.*).

This opinion warrants little, rather than great or controlling weight, for several reasons. Although somewhat supported by the narrative discussion of the noted

43

diagnoses and symptoms contained therein (see id.), it is noteworthy that Dr. Swaringen had seen the claimant only once at the time she rendered the extremely restrictive opinion (See Exhibit 40F; 41F/1-6). Although examination conducted by Dr. Swaringen revealed very poor memory, limited orientation, limited attention and concentration, a dysphoric, irritable mood and affect, and limited fund of knowledge, memory, insight, and judgment, these abnormalities were likely exacerbated by the claimant's current treatment noncompliance, as he had been without medications since February 2019, and had not undergone outpatient medication management since February 2018 (Exhibit 41F/1-6). In addition, Dr. Swaringen did not engage in a treating relationship with the claimant, as she did not see him after the May 25, 2019 visit, given that Dr. Swaringen was leaving Signature Health (*Id.*). Finally, the extremely restrictive opinion is inconsistent with the findings on subsequent examination in January 2020, presumably during a period of medication compliance, which included limited orientation, very poor memory at baseline, slow speech with low volume, slowed thought processes, and questionable insight and judgment, but normal alertness, calm, cooperative behavior, adequate eye contact, good grooming and hygiene, appropriate language, organized, linear thought processes, logical associations, no overt psychosis, and no suicidal or homicidal ideation (Exhibit 45F). In addition, the opinion is inconsistent with the indications of record of more extensive activities of daily living than reported by the claimant, which have included doing simple cooking tasks for himself, attending AA, playing basketball with his nephew at a rec center, writing in a journal, going places alone, helping an older uncle, which has included assistance with managing his finances, helping an ill friend, including helping care for her pet dog, going to church, using public transportation and provide-a-ride transportation service, at times independently, and attending band festivals (Exhibit 5F; 7F/6; 12F/4, 17, 26, 34, 53, 72; 16F/8; 23F/10). For these reasons, I give Dr. Swaringen's opinion little weight.

* * *

Charles Carlson, D.O., opined on April 25, 2020 that the claimant experiences extreme limitations regarding his ability to described work activity to someone else, recognize a mistake and correct it, identify and solve problems, sequence multi-step activities, use reason and judgment to make work related decisions, handle conflicts with others, state own point of view, respond to requests, suggestions, criticism, correction, and challenges, keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness, work at an appropriate and consistent pace, complete tasks in a timely manner, ignore or avoid distractions while working, change activities or work settings without

44

being disruptive, work close to or with others without interrupting or distracting them, sustain an ordinary routine and regular attendance at work, work a full day without needing more than the allotted number or length of rest periods during the day, respond to demands, adapt to changes, manage one's psychologically based symptoms, distinguish between acceptable and unacceptable work performance, make plans for oneself independent of others, and be aware of normal hazards and take appropriate precautions (Exhibit 46F). Dr. Carlson noted marked limitations regarding the claimant's ability to understand and learn terms, instructions, or procedures, follow 1 or 2 step oral instructions to carry out a task, ask and answer questions and provide explanations, ask for help when needed, initiate or sustain conversation, set realistic goals, and maintain personal hygiene and attire appropriate to a work setting (*Id.*). Dr. Carlson noted moderate limitations regarding the claimant's ability to cooperate with others and understand and respond to social cues, and mild limitations regarding the claimant's ability to initiate and perform a task that he understands and knows how to do (*Id.*). In support of his opinion, Dr. Carlson noted a diagnosis of schizoaffective disorder, which can substantially limit life activities as mentioned above compared to most people in the general population (*Id.*).

This opinion warrants little, rather than great or controlling weight, for several reasons. First, the opinion, rendered on a pre-printed, check-the-box form, is inadequately supported, as the opinion contains extremely limited narrative discussion of the bases for the restrictions contained therein, as Dr. Carlson provided a mental impairment diagnosis, but did not mention any reported symptoms or noted psychiatric abnormalities on examination to support the primarily extreme and marked limitations contained therein (See Id.). In addition, the opinion is inadequately supported by Dr. Carlson's most recent treatment notes, namely the January 27, 2020 visit, which appears to have been conducted after several months without any formal mental health treatment (See Exhibit 41F, 45F). More specifically, the opinion is inadequately supported Dr. Carlson's own examination at the time, which revealed findings of limited orientation, slow speech with low volume, slowed thought processes, baseline very poor memory, and questionable insight and judgment, but normal alertness, calm, cooperative behavior, adequate eye contact, good grooming and hygiene, appropriate language, organized, linear thought processes, no overt psychosis, as the claimant was not responding to internal stimuli, and no suicidal or homicidal ideation (Exhibit 45F). In addition, the opinion is inconsistent with the remaining evidence of record, including the immediately preceding May 2019 examination findings of limited orientation, a dysphoric, irritable mood and affect, and limited attention, concentration, memory, fund of knowledge,

45

> insight, and judgment, but fair eye contact, fluent speech, goal-directed thought processes, and logical associations, despite being off medications for several months at the time (Exhibit 41F/1-6). Finally, the extremely restrictive opinion is inconsistent with the claimant's rather extensive activities of daily living noted above, which have included attending AA, playing basketball with his nephew at a rec center, going places alone, helping an older uncle, helping an ill friend, using public transportation and provide-a-ride transportation service, at times independently, and attending church and band festivals (Exhibit 5F; 7F/6; 12F/4, 17, 26, 34, 53, 72; 16F/8; 23F/10). For these reasons, Dr. Carlson's opinion warrants little, rather than great or controlling weight.

(Tr. 1197-1200.)

As the ALJ explained, Nurse Wiseley-Cortland was not an acceptable medical source and therefore could not be considered a treating source whose opinion was entitled to controlling weight under the regulations.  20 C.F.R. §§ 404.1502, 404.1527, 416.902, 416.927.  As non-treating sources, the ALJ owed no deference to the opinions of Drs. Swaringen and Carlson.[10]  An ALJ is not required to give "good reasons" for rejecting a non-treating or non-examining opinion.  *Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 753 (N.D. Ohio 2018) (citation omitted).

The ALJ considered and weighed the medical opinion evidence of record and provided an explanation for the weight assigned.  It is the ALJ's duty, not this Court's, to weigh the evidence and resolve any conflicts, and she did so here.

Although Johnson cites evidence from the record he believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton*, 246 F.3d at 772-73.  Indeed, the Sixth Circuit has

---

[10] Although Johnson argues Dr. Swaringen had taken over for Nurse Wiseley-Cortland and had the benefit of past medical records (Doc. No. 9 at 30), Johnson appears to concede Drs. Swaringen and Carlson were examining sources.  (*Id.* at 35)  ("The ALJ erred in failing to provide greater weight to consistent opinions from treating physician Campbell, examining physicians and Nurse Wiseley-Cortland.")

made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no error.

## B.  Second Assignment of Error: Off-Task Limitation

In his second assignment of error, Johnson argues the ALJ's RFC should have included a limitation regarding off-task behavior, as the "'rare and 'extreme' limitations offered by Drs. Campbell, Swaringen, and Carson, and Nurse Wiseley-Cortland would at least support more than a 10% off task limitation." (Doc. No. 9 at 36.)  Johnson maintains that the "combination of his memory issues, auditory hallucinations, and deteriorating cognitive ability" supported such an off-task limitation, which would have rendered a finding of disability.  (*Id.* at 37-38.)

In response, the Commissioner argues that the ALJ's RFC, which was based on the state agency reviewing sources' opinions, included limitations that would "eliminate[] circumstances in which Plaintiff would likely be off task due to symptoms, such as while performing complex tasks, or while working around members of the public." (Doc. No. 12 at 23-24.)  The Commissioner asserts Johnson fails to show that the RFC limitations were insufficient to accommodate his impairments.  (*Id.* at 24.)  The Commissioner further argues that Johnson's argument is "largely dependent on her [sic] previous arguments about weighing opinions." (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(2),

47

416.927(d)(2).   An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. §§ 404.1546(c), 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes

48

only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

The ALJ found Johnson possessed the following RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: has the capacity to understand and remember directions for simple tasks; has the capacity to perform these simple tasks in an environment without the requirement to meet strict production goal demands; has the capacity to work where interactions with coworkers and supervisors are occasional and superficial, and there are no interactions with the general public; has the capacity to work where changes are infrequent and thoroughly explained.

(Tr. 1184.)

49

To the extent Johnson bases his off-task argument on the basis of the opinions of Drs. Campbell, Swaringen, and Carlson, as well as Nurse Wiseley-Cortland, for the reasons set forth in detail above, the ALJ did not err in assigning little weight to these opinions.  Moreover, the RFC is consistent with the opinions of the state agency reviewing psychological consultants, to which the ALJ assigned great weight. (Tr. 1193-94.)  The ALJ found the limitations in the state agency reviewing psychological consultants' opinions persuasive because they were supported by the evidence of record.  (*Id.*)  The Commissioner's argument that the ALJ's RFC already addressed time off-task by eliminating the circumstances that would take Johnson off-task is well-taken.  Johnson fails to show that these restrictions do not accommodate his limitations.  Again, although Johnson cites evidence from the record he believes supports a more restrictive RFC, the ALJ's findings are subject to reversal "merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton*, 246 F.3d at 772-73.

The Court is able to trace the path of the ALJ's reasoning regarding Johnson's RFC.  There is no error.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: June 2, 2022                                        *s/ Jonathan Greenberg*
                                                         Jonathan D. Greenberg
                                                         United States Magistrate Judge

50

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).